# Illinois Official Reports

## Appellate Court

---

### *KT Winneburg, LLC v. Roth*, 2020 IL App (4th) 190274

---

| | |
|---|---|
| Appellate Court Caption | KT WINNEBURG, LLC, a Missouri Limited Liability Company Registered to Do Business in the State of Illinois, Plaintiff-Appellant, v. LISA ROTH, in Her Official Capacity as Collector and Treasurer of Calhoun County, Illinois, and CALHOUN COUNTY, Defendants-Appellees (The Board of Education of Brussels Community Unit School District No. 42, Intervenor-Appellee). |
| District & No. | Fourth District<br>No. 4-19-0274 |
| Filed | April 7, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Calhoun County, No. 14-TX-7; the Hon. Robert Adrian, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Elliott L. Turpin, of Carrollton, for appellant.<br><br>Richard J. Ringhausen, State's Attorney, of Hardin (Patrick Delfino, of State's Attorneys Appellate Prosecutor's Office (Christopher E. Sherer and John M. Gabala, of Giffin, Winning, Cohen & Bodewes, P.C., of Springfield, of counsel), for appellee Lisa Roth.<br><br>H. Allen Yow and Koert J. Brown, of Rammelkamp Bradney, P.C., of Jacksonville, for other appellee. |

Panel    JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, KT Winneburg, LLC, owns some platted and subdivided land in Calhoun County, Illinois. For the 2013 tax year, the Calhoun County Board of Review classified the land as entirely residential, even though the land was unimproved and, to the extent it was not timberland, had been used for the growing and harvesting of crops. Plaintiff filed a tax objection complaint in the Calhoun County circuit court, naming, as defendant, Lisa Roth, in her official capacity as Collector and Treasurer of Calhoun County, Illinois. Also, the Board of Education of Brussels Community Unit School District No. 42 obtained leave to intervene, and on plaintiff's motion for joinder, Calhoun County, Illinois (the county), was added as a defendant. Against those three entities (collectively, defendants), plaintiff maintained that the land should have been classified in the 2013 tax year as farmland—a classification that would have resulted in a lower assessment and, hence, a lower property tax.

¶ 2    After granting a section 2-619 motion by defendants to dismiss, with prejudice, count II of plaintiff's amended complaint (see 735 ILCS 5/2-619 (West 2016)), the circuit court held a bench trial on the remaining count. In its written decision, the court found, pursuant to a stipulation by the parties, that 5 of the 89 parcels should be classified as common ground. See 35 ILCS 200/10-35 (West 2018). As for the remaining 84 parcels, the court found a failure to prove, by clear and convincing evidence, that the residential classification was incorrect. Plaintiff appeals on two grounds.

¶ 3    First, plaintiff argues that the circuit court erred by granting defendants' motion to dismiss count II of the amended complaint. In count II, plaintiff sought to enforce an alleged settlement agreement with the county—as plaintiff previously tried to do, without success, in litigation before the Property Tax Appeal Board. Because of the unappealed final decision in that administrative litigation, we find plaintiff to be collaterally estopped from asserting the enforceability of the settlement agreement. Thus, we affirm the dismissal of count II.

¶ 4    Second, plaintiff argues that the circuit court clearly erred by confirming the county board's assessments of the non-common-ground parcels as residential property. We agree. No one lived on the land or built a house on it. To the extent the land was used at all, it was used only as farmland. To be assessed as farmland, land must be used as farmland for three consecutive years, that is, not only for the tax year in question but also for the preceding two years. 35 ILCS 200/10-110 (West 2012). To the extent that the 84 non-common-ground parcels were not timberland, the only use to which they were put from 2011 to 2013 was the growing and harvesting of crops. The cropland and the timberland alike met the statutory definition of farmland. See *id.* §§ 1-60, 10-110, 10-125(a), (c).

¶ 5    Therefore, we affirm in part and reverse in part the circuit court's judgment.

## I. BACKGROUND

The amended complaint had two counts.

In count I, plaintiff alleged that, for the 2013 tax year, the Calhoun County Board of Review assessed the land as residential property whereas the land always had been used, and continued to be used, as farmland. Plaintiff also claimed to be entitled to a developer's exemption. (We will explain all these terms in a moment.)

In count II, plaintiff accused the county of reneging on an oral settlement agreement. Allegedly, the county and plaintiff reached the agreement in February 2014, in a hearing before the Property Tax Appeal Board on the 2010 assessments. (Again, the present case concerns the 2013 assessments, which, this time, plaintiff chose to challenge in the circuit court instead of before the Property Tax Appeal Board. If a taxpayer is dissatisfied with a decision by the board of review, the taxpayer may either appeal to the Property Tax Appeal Board or file a tax objection complaint in the circuit court. *Dumas v. Pappas*, 2014 IL App (1st) 121966, ¶ 17.) The alleged settlement covered not only the 2010 tax year but succeeding tax years. According to count II, the county, through Special Assistant State's Attorney Christopher E. Sherer, agreed as follows: "[F]or the tax years 2010 through 2013, the total assessment for the aggregate of all of the lots *** would be $20,000.00; then beginning in tax year 2014, the property would be assessed as farmland or timber, whichever was the current use on each lot in question, until the use of the lots changed."

Pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2016)), defendants moved to dismiss count II of the amended complaint. One of the grounds for the requested dismissal was collateral estoppel. The estopping decision, according to defendants, was the final decision by the Property Tax Appeal Board in the administrative litigation over the 2010 assessments. In its decision, the Property Tax Appeal Board adopted and incorporated its administrative law judge's denial of plaintiff's motion to enforce the settlement agreement. The rationale for the denial was that the oral agreement was nonbinding on the county because when Sherer presented the agreement to the county board, the agreement was voted down. (After the settlement negotiations, Sherer reported back to the administrative law judge: " 'I have been informed by the County Board Chairman that the Intervenor (Calhoun County) will not be agreeing to stipulate in this matter.' ") Therefore, the Property Tax Appeal Board decided, there was no meeting of the minds. Plaintiff never sought judicial review of the Property Tax Appeal Board's final decision. As a result, defendants argued in their section 2-619 motion, plaintiff now was collaterally estopped from asserting the enforceability of the settlement agreement. See *id.* § 2-619(a)(4). Defendants had a fallback argument for dismissing count II: they argued that Sherer had lacked authority from the county to enter into the oral settlement agreement.

In March 2018, the circuit court granted defendants' motion to dismiss count II with prejudice. While the court disagreed with defendants that Sherer lacked authority to settle for the 2010 tax year, the court agreed that he lacked authority to settle for tax years after 2010. The insufficiency of his authority, the court reasoned, lay in the open-endedness of the settlement agreement. The agreement purported to bind all the taxing districts, even though they had received no notice that any tax years other than 2010 were in dispute in the administrative litigation. Two further reasons the court gave for the dismissal of count II were collateral estoppel and (a point none of the defendants had raised) the lack of consideration to

support a settlement contract. So, count II of the amended complaint was stricken, and count I was left standing.

¶ 12     In November 2018, a bench trial on count I commenced. The evidence tended to show the following.

¶ 13     In 2008, in a sheriff's sale, plaintiff bought some land that already had been platted and subdivided. The land was made up of 89 parcels organized into four subdivisions: Winneburg Estates, Deer Trail, Fox Run, and Eagle's Nest.

¶ 14     All of this land was zoned as residential, specifically, R-2, for single-family residences. There had been some development to prepare the land for residential use. Water lines and telephone lines ran along some of the streets. A water line ran part of the way into Deer Trail subdivision, but there were no water meters. There were some electrical boxes near Fox Run and Deer Trail subdivisions, but none of the parcels had electrical service. Thirty-five houses had been built adjacent to plaintiff's land. No houses stood on plaintiff's land. Even so, restrictive covenants required that plaintiff's land be used only in ways that would keep it attractive for residential purposes. The covenants forbade any commercial use of the land. From 2011 to 2013, plaintiff had been marketing the land as ideal for the construction of single-family residences. Plaintiff, however, had built no gutters, sidewalks, or sewers.

¶ 15     Instead, from 2011 to 2013, Bobby Weischaar, with plaintiff's permission, had been planting and harvesting corn and soybeans on 14 of the 89 parcels—even though, under the Calhoun County zoning ordinances, farming was impermissible in R-2 zones. Plaintiff had no crop share lease with Weischaar. Plaintiff bore none of the expenses of the farming and shared none of the profits. Plaintiff allowed Weischaar to farm the 14 parcels for free, to keep down the Johnson grass and to save on mowing. Crops looked better than weedy, overgrown parcels.

¶ 16     The 14 parcels in cultivation were in Winneburg Estates subdivision. They were farmed right up to the point where the terrain sloped down steeply into timber. The parties stipulated that the other three subdivisions—Deer Trail, Fox Run, and Eagle's Nest—were substantially timberland. This timberland, the parties further stipulated, was not being managed under a forestry management plan approved by the Illinois Department of Natural Resources.

¶ 17     After the presentation of the evidence, including an onsite viewing of the land and the submission of written arguments, the circuit court entered a judgment in favor of the defendants and against plaintiff on the remaining count of the amended complaint, count I.

¶ 18     In its written decision, the circuit court first considered the 14 parcels that had been under cultivation, for if those parcels failed to qualify as farmland, the remaining non-common-ground parcels would not be "other farmland." ("Other farmland" is a type of farmland, as we soon will explain.) The court found that the 14 parcels were not farmland. In so finding, the court relied on section 1-60 of the Property Tax Code (35 ILCS 200/1-60 (West 2012)), which excluded from the definition of a farm any property that, though used for the growing and harvesting of crops, was used primarily for residential purposes. The court reasoned:

> "The parcels in question are platted as residential lots. The parcels were developed as residential lots. The parcels are zoned as single family residential. The parcels are being marketed as single family residential lots. Additionally, the crops were actually being grown to further the parcel's use as residential property. Ken Howard [(plaintiff's owner)] testified that the crops were being planted to keep down the Johnson grass and weeds, and the crops looked better than the weeds. He did not receive any income from

the crops because he did not want the local person who farmed the property to lose any income. (Goodwill helpful to market the lots.) All of these facts show that the primary use of these parcels is as residential lots."

Having found that the parcels with growing crops were not a farm, the court concluded that the rest of the lots could not possibly be "other farmland." Nor, without a farm, could there be any "wasteland" (another type of farmland).

¶ 19 The circuit court next addressed plaintiff's claim to a developer's exemption pursuant to section 10-30 of the Property Tax Code (*id.* § 10-30). Because plaintiff, instead of being the developer, was a buyer of the property after it was developed, the court held the developer's exemption to be inapplicable. The court wrote:

"The purpose of the statute is to encourage owners to develop their properties. Plaintiff did not develop the property in question. Plaintiff purchased the property after it was already developed. The property had already been platted. Utilities were already installed throughout the development, and roads were already built. The only developing plaintiff did to the property was to extend some existing roadway and cut some minor roads. The statute was never intended to grant relief to a subsequent purchaser of the property. The intent is shown by subsection (c) of the statute [(35 ILCS 200/10-30(c) (West 2012))] which states that this provision no longer applies after the initial sale of any lot, including a lot which is vacant. The property in question was sold several times since it was platted and developed. Plaintiff is a subsequent purchaser, not the developer. Plaintiff does not qualify for relief under the statute."

¶ 20 In sum, then, the circuit court found that the five parcels subject to the common-ground stipulation should be assessed at $100 apiece. As for the remaining 84 parcels, however, the court found a failure to prove, by clear and convincing evidence, that the residential assessments were incorrect.

¶ 21 This appeal followed.

¶ 22 II. ANALYSIS

¶ 23 A. Collateral Estoppel and Count II

¶ 24 The logical first step in this appeal is to address the claim that plaintiff makes in count II of the amended complaint, namely, that on February 24, 2014, in litigation before the Property Tax Appeal Board, plaintiff and the county entered into a settlement agreement. If, as plaintiff claims in count II, the county settled with plaintiff by agreeing that, "for the tax years 2010 through 2013, the total assessment for the aggregate of all of the lots *** would be $20,000," it seemingly would make no difference how the lots *should* have been classified for the tax year 2013. But see 86 Ill. Adm. Code 1910.72 (2005) (providing that settlement negotiations are "subject to any further review and/or approval by the [Property Tax Appeal] Board"). Regardless of which classifications the lots deserved under statutory law, the total assessment would be $20,000, as the settlement agreement stipulated. So, we will begin by scrutinizing, *de novo*, plaintiff's claim that, in the litigation before the Property Tax Appeal Board, plaintiff reached a settlement binding on the county. See *Palos Bank & Trust Co. v. Illinois Property Tax Appeal Board*, 2015 IL App (1st) 143324, ¶ 10 ("We review a section 2-619 dismissal *de novo*.").

¶ 25    In their motion to dismiss count II pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2016)), defendants did not dispute that plaintiff had settled with the supervisor of assessments, Patricia Langland, and the special assistant state's attorney, Christopher E. Sherer. Plaintiff, Langland, and Sherer orally agreed that the total assessment of plaintiff's lots would be $20,000 for each of the four tax years from 2010 to 2013. Defendants did not dispute the existence of this oral agreement between plaintiff, Langland, and Sherer. See *Better Government Ass'n v. Illinois High School Ass'n*, 2017 IL 121124, ¶ 21 (noting that "[a] motion to dismiss under section 2-619 admits well-pleaded facts"). Nevertheless, in defendants' view, plaintiff was collaterally estopped from seeking to enforce this agreement.

¶ 26    According to defendants, there were two reasons for the collateral estoppel. First, on May 6, 2015, an administrative law judge with the Property Tax Appeal Board denied plaintiff's motion to enforce the settlement agreement. The administrative law judge ruled, on the authority of *Meade v. City of Rockford*, 2015 IL App (2d) 140645, that because the county board had voted to reject the oral settlement agreement, the Property Tax Appeal Board "[could not] mandate enforcement of the settlement against the [county board]." Second, in its final unappealed decision of May 20, 2016, the Property Tax Appeal Board "adopted" the administrative law judge's ruling on plaintiff's motion to enforce the settlement agreement and "incorporated [the ruling] in full as if set forth in [its] decision."

¶ 27    If this final decision by the Property Tax Appeal Board was "adjudicatory, judicial, or quasi[-]judicial in nature" (*Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 71), it can have issue-preclusive effect: in subsequent litigation, it can collaterally estop a party (see *Village of Alsip v. Portincaso*, 2017 IL App (1st) 153167, ¶ 27). "Collateral estoppel precludes the relitigation of any matter in issue which was actually or necessarily decided in a previous claim or cause of action between the same parties or their privies." *Schratzmeier v. Mahoney*, 246 Ill. App. 3d 871, 875 (1993). The matter in issue can be factual or legal; collateral estoppel applies not only to findings of fact but also to conclusions of law. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 79 (2001).

¶ 28    In a nutshell, then, the rule of administrative collateral estoppel is this: if in a quasi-judicial proceeding an administrative agency issues a final decision, the legal and factual findings in the decision will, in future civil litigation, bind the parties and their privies, provided that the findings were necessary to resolve the issues before the administrative agency (*Terry v. Watts Copy Systems, Inc.*, 329 Ill. App. 3d 382, 389 (2002)) and provided that issue-preclusion would work no injustice (see Restatement (Second) of Judgments § 28 (1982)).

¶ 29    Plaintiff does not dispute that the Property Tax Appeal Board acted in a quasi-judicial or adjudicatory capacity; that its decision of May 20, 2016, was final; and that plaintiff was a party to the administrative litigation. Even so, for three reasons, plaintiff disputes that it is collaterally estopped from asserting the enforceability of the settlement agreement.

¶ 30    First, plaintiff denies that the issue raised in count II of the amended complaint is identical to an issue the Property Tax Appeal Board decided. The procedural vehicles in the two cases were different. Consequently, plaintiff reasons, the issues were different. Plaintiff filed a *motion* with the Property Tax Appeal Board, whereas count II was an *action* in and of itself. The elements of a motion to enforce a settlement agreement, plaintiff argues, are different from the elements of an action to enforce a settlement agreement. A party moving to enforce a settlement agreement during the pendency of a case must prove (1) the liability of the other

party, (2) the agreement as to the amount to be paid, and (3) the acceptance of the offer in settlement of the dispute. *McAllister v. Hayes*, 165 Ill. App. 3d 426, 427 (1988). But when bringing an independent action to enforce a settlement, the party must prove (1) the existence of a contract, (2) the plaintiff's performance of the contract, (3) the defendant's breach of the contract, and (4) damages resulting from the breach. *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849, ¶ 40. Plaintiff reasons that because "[t]he elements of a *suit* to enforce a settlement agreement present different issues of law and proof than a *motion* to enforce a settlement agreement," the issue the Property Tax Appeal Board decided is different from the issue raised in count II. (Emphases in original.)

¶ 31    Assuming, for the sake of argument, that the elements are essentially different depending on whether a party *moves* to enforce a settlement agreement or *sues* to enforce one, collateral estoppel does not require an identity of *elements*. Collateral estoppel does not require that the claim in the first litigation have the same elements as the claim in the subsequent litigation. Instead, a party is collaterally estopped when an "issue decided in the prior adjudication is identical with the one presented in the suit in question." *Gumma v. White*, 216 Ill. 2d 23, 38 (2005).

¶ 32    The issue in count II, plaintiff informs us, was whether plaintiff and the county had a settlement contract. A contract is "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 1:1, at 2-3 (4th ed. 1990). If, as the Property Tax Appeal Board decided, plaintiff had no enforceable settlement agreement with the county, plaintiff now is collaterally estopped from asserting the existence of a contract—because a contract is, by definition, a promise or set of promises that the law will enforce (*id.*). Whether a settlement contract existed was an issue the Property Tax Appeal Board resolved against plaintiff. That issue cannot be relitigated. "Collateral estoppel, or issue preclusion, prevents relitigation of issues of law or fact that have previously been litigated and decided in an action involving the same parties or their privies." *In re Huron Consulting Group, Inc.*, 2012 IL App (1st) 103519, ¶ 22.

¶ 33    The second reason why plaintiff contests the applicability of collateral estoppel is that, according to plaintiff, "there was no final judgment on the issue of the settlement agreement in the 2010 *** case [before the Property Tax Appeal Board]." Plaintiff admits that "there was ultimately a final judgment in the [Property Tax Appeal Board] case." Nevertheless, that "final judgment," plaintiff argues, "did not concern the settlement agreement, but merely concerned the 2010 tax assessments." We disagree. The text of the Property Tax Appeal Board's decision addresses both questions: first, whether the settlement agreement was enforceable against the county, and, second, what the amounts of the assessments for 2010 should be.

¶ 34    Plaintiff suggests that the Property Tax Appeal Board's refusal to enforce the settlement agreement was like the denial of a motion for summary judgment (see *City of Chicago v. Ramirez*, 366 Ill. App. 3d 935, 945-46 (2006)), which case law regards as a nonfinal, nonappealable decision (*Direct Auto Insurance Co. v. Koziol*, 2018 IL App (1st) 171931, ¶ 19). The reason, however, why the denial of a motion for summary judgment is nonappealable is that "[a]ny error in the denial of a motion for summary judgment merges into the final judgment rendered by the trial court[ ] and it is from that final judgment that an appeal is taken." *Id.* Thus, in an appeal from a final judgment, a party could challenge the refusal to enforce a settlement agreement (provided that the party has done everything necessary to preserve the

issue). See *id.* It is just that the refusal must be appealed at the right time—after the final judgment. See *id.* Plaintiff could have sought and obtained administrative review of the Property Tax Appeal Board's final decision. See *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010) (holding review of the Property Tax Appeal Board's decisions is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2008))). In such an action for administrative review, plaintiff could have argued that, instead of deciding what the assessed values of the 89 parcels should have been for the 2010 tax year, the Property Tax Appeal Board simply should have imposed an aggregate assessment of $20,000 in accordance with the settlement agreement. Plaintiff never brought such an action for administrative review. Therefore, plaintiff is collaterally estopped by the Property Tax Appeal Board's decision that the settlement agreement is unenforceable against the county.

¶ 35 The third reason why plaintiff contests the applicability of collateral estoppel is that the Property Tax Appeal Board's denial of the motion to enforce the settlement agreement was, plaintiff argues, "not essential to its final decision as to the tax assessments for the year 2010." For an administrative finding to collaterally estop a party, the finding must be "essential or necessary to the question before the [agency]." *Terry*, 329 Ill. App. 3d at 389-90. The American Law Institute explains the requirement of essentiality this way:

> "If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made. In these circumstances, the interest in providing an opportunity for a considered determination, which if adverse may be the subject of an appeal, outweighs the interest in avoiding the burden of relitigation." Restatement (Second) of Judgments § 27 cmt. h (1982).

¶ 36 The refusal to enforce a settlement agreement is not a throwaway *dictum*. Such a refusal is quite consequential and can legitimately be a subject of an appeal (see *In re Marriage of Frank*, 2015 IL App (3d) 140292, ¶ 1; *Ramirez*, 366 Ill. App. 3d at 946; *Kandalepas v. Economou*, 269 Ill. App. 3d 245, 247 (1994))—as, come to think of it, the present appeal demonstrates. The enforceability or nonenforceability of the settlement agreement was, in the administrative litigation, an essential threshold issue. As such, it was ultimately an appealable issue. See 735 ILCS 5/3-110 (West 2008) ("The hearing and determination shall extend to all questions of law and fact presented by the entire record before the court."). The Property Tax Appeal Board needed to determine 2010 assessments only if it declined to enforce the asserted settlement agreement that the aggregate assessment for 2010 would be $20,000. In other words, before adjudicating the dispute, the Property Tax Appeal Board had to decide whether the dispute had been settled, and hence, whether there still was a dispute to be adjudicated. A valid settlement would have ended the case, making an evaluation of the merits unnecessary. The same would be true of the present case. Thus, we conclude, contrary to plaintiff's argument, that the enforceability of the settlement agreement was "material to the determination of both causes." *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 153-54 (1994).

¶ 37 According to the final, unappealed decision of the Property Tax Appeal Board, the settlement agreement is unenforceable. That means there will be no relitigation of the enforceability of the settlement agreement. The doorway to that issue is bricked up.

Consequently, we affirm the dismissal of count II of the amended complaint on the ground of collateral estoppel.

¶ 38   The rest of the controversy over count II is academic. It does not matter whether Sherer had authority to bind the county. Right or wrong, the administrative law judge's ruling, adopted by the Property Tax Appeal Board, is final and unassailable. See *Lady v. Montgomery Ward & Co.*, 80 Ill. App. 3d 69, 73 (1980).

¶ 39                                    B. Cropland
¶ 40                     1. Use Solely for the Growing and Harvesting of Crops
¶ 41   Plaintiff claims that, from 2011 to 2013, 14 parcels were "used solely for the growing and harvesting of crops" (35 ILCS 200/1-60 (West 2012)) and that, accordingly, those parcels should have been assessed as "[c]ropland" (*id.* §§ 10-110, 10-125(a)). See also *id.* § 10-110 (providing that, to be assessed as farmland, the land must have been used as farmland for the two preceding years). In his testimony before the circuit court, Howard identified the 14 parcels by the numbers they had in plaintiff's exhibit No. 2: parcel Nos. 1, 2A, 2B, 5, 6, 8, 10, 11, 33A, 33B, 34A, 34B, 35A, and 35B. (Defendants, apparently referring to a different exhibit, identify the 14 parcels as parcel Nos. 50 to 56 and 79 to 85 in the Winneburg subdivision. Evidently, though, the parties mean the same 14 parcels.) Howard testified that in 2011, 2012, and 2013, crops were grown and harvested on the 14 parcels—either corn or soybeans. Therefore, plaintiff argues, those parcels met the statutory definition of a farm.

¶ 42   Section 1-60 of the Property Tax Code defines the term "[f]arm" as follows:

> "§ 1-60. Farm. When used in connection with valuing land and buildings for an agricultural use, any property used solely for the growing and harvesting of crops; for the feeding, breeding and management of livestock; for dairying or for any other agricultural or horticultural use or combination thereof; including, but not limited to, hay, grain, fruit, truck or vegetable crops, floriculture, mushroom growing, plant or tree nurseries, orchards, forestry, sod farming and greenhouses; the keeping, raising and feeding of livestock or poultry, including dairying, poultry, swine, sheep, beef cattle, ponies or horses, fur farming, bees, fish and wildlife farming. The dwellings and parcels of property on which farm dwellings are immediately situated shall be assessed as a part of the farm. Improvements, other than farm dwellings, shall be assessed as a part of the farm and in addition to the farm dwellings when such buildings contribute in whole or in part to the operation of the farm. For purposes of this Code, 'farm' does not include property which is primarily used for residential purposes even though some farm products may be grown or farm animals bred or fed on the property incidental to its primary use. The ongoing removal of oil, gas, coal or any other mineral from property used for farming shall not cause that property to not be considered as used solely for farming." *Id.* § 1-60.

¶ 43   In statutory interpretation—a task we perform *de novo* (see *City of Charleston v. System of Administrative Hearing of the City of Charleston*, 2019 IL App (4th) 180634, ¶ 25)—we give the words of the statute their ordinary meanings unless the statute specially defines words (and then we give the words in the special definitions their ordinary meanings) (*Turner v. Orthopedic & Shoulder Center, S.C.*, 2017 IL App (4th) 160552, ¶ 64). Section 1-60 does not specially define the word "used." Thus, we give that word its ordinary meaning, which can be found in a dictionary. See *id.* To "use" something means to "put [it] into action or service."

- 9 -

Merriam-Webster Dictionary 795 (2004). Another dictionary defines "use" as follows when the word is used with reference to land: "To make use of (land, ground, etc.) by working, tilling, or occupying." 19 Oxford English Dictionary 354 (2d ed. 1989).

¶ 44     Zoning unimproved land as residential, platting it as residential, covenanting it as residential, and marketing it as residential are not the same as putting the land into service, or occupying it, for residential purposes—especially if, instead of residences, only crops and timber are on the land. See 35 ILCS 200/1-60 (West 2012). The residential zoning, covenanting, and marketing of vacant lots envision that the lots *shall* or *will be* used for residential purposes, not necessarily that they *are* being so used right now. They are not determinative of present use. Even if the present nonresidential use violates a zoning ordinance or restrictive covenant, *ought* is not the same as *is*. Section 1-60, by its terms, cares only about *is*: how the land *now* is being "used." See *id.*

¶ 45     The distinction between the ideal or projected use of unimproved land and its present use is illustrated by *Santa Fe Land Improvement Co. v. Illinois Property Tax Appeal Board*, 113 Ill. App. 3d 872 (1983). In *Santa Fe*, the landowner bought some land, zoned as industrial, that already had "industrial capacity water and sewer lines." *Id.* at 873. The landowner built some roads on the land, and Santa Fe Railway built a railway spur line to serve the land. *Id.* "[I]ndustrial park sites [were] marketed" (*id.*), and the landowner even succeeded in selling off some portions of the land "as industrial sites" (*id.* at 873-74). The remaining, unsold land, to the extent it was tillable, was planted in soybeans, corn, and wheat. *Id.* at 873. But the crop share leases "contain[ed] provisions for the purchase of crops and conversion of the leaseholds to industrial use" (*id.*) as soon as such an industrial opportunity arose. Even though every tillable acre of the unsold land was farmed and the only buildings on the unsold land were farm buildings (*id.* at 873-74), it was obvious that the landowner's vision for the land was industrial.

¶ 46     Given the substantial steps taken to realize that vision, the issue was "whether the land in question [was] used for farming." *Id.* at 874. The defendants, the Illinois Property Tax Appeal Board and the Will County Board of Review, argued that the *potential* and *intended* use of the land disqualified the land from an agricultural classification. See *id.* at 875. It was undisputed, the defendants observed, that "the property *can* be used for industrial development sites" and that the landowner "*intends* to so use the property." (Emphases added.) *Id.* The crop share leases were written "to facilitate such use." *Id.* Such facts, in the defendants' view, "compel[led] the conclusion that the land [was] not used *solely* for the growing and harvesting of crops." (Emphasis added.) *Id.* To be sure, the land was farmed, but the farming was merely a place-filler, a temporary expedient. There was a primary, underlying use of the land, the defendants insisted, and that use was industrial.

¶ 47     The appellate court disagreed with the defendants because, despite the expensive preparations for industrial use, the land presently was used only for the growing and harvesting of crops. The appellate court wrote:

> "We therefore conclude that the present use of land determines whether it receives an agriculture or nonagricultural valuation. This being the case, the lands in question which in 1978 were farmed and had not been sold as industrial development sites were used solely for the growing and harvesting of crops. In so holding, we recognize that lands which were not farmed in 1978 and which were improved primarily to serve industrial landowners may appropriately be valued on a nonagricultural basis.

As we have concluded the property in question was used solely for the growing and harvesting of crops, it follows that it also was devoted primarily to the raising and harvesting of crops." *Id.* at 875-76.

Thus, it is not the landowner's ambition for the land, the highest and best use of the land, or the preparation for future use that counts when determining whether the land deserves an agricultural valuation. What counts, instead, is the present use of the land.

¶ 48 The statute designates "the growing and harvesting of crops" as a *bona fide* agricultural use—period. 35 ILCS 200/1-60 (West 2012). The statute does not require that the landowner have a particular motive in cultivating the land or that the landowner have a long-term grand plan that is agricultural. All the statute requires is "[f]arm" activities, such as growing and harvesting crops, cultivating orchards, or raising livestock, poultry, or bees. See *id.* That is it. The statute does not require a crop share lease. Nor does the statute require that the crops be grown and harvested for the landowner's profit. Nor does the statute require the lack of a desire to sell the land to housebuilders and a lack of preparations toward that end. Nor does the statute require any particular zoning classification. Nor does the statute require that the land be free of restrictive covenants or nonadjacent to dwellings. Nor does the statute require that the farm activities be permissible under any existing zoning ordinances and restrictive covenants. None of those conditions are in the text of section 1-60. "We must not depart from the plain language of the [statute] by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent." *Barnett v. Zion Park District*, 171 Ill. 2d 378, 389 (1996).

¶ 49 The express legislative intent is the statute as written, which unconditionally equates farming with the growing and harvesting of crops. See 35 ILCS 200/1-60 (West 2012). It appears to be undisputed that the 14 parcels were in cultivation from 2011 to 2013, they had no dwelling on them, and they were not appurtenant to any dwelling. Those parcels were used only for the growing and harvesting of corn and soybeans. Although the 14 parcels were marketed as sites suitable for the construction of single-family residences and although some preparations had been made for their future potential use as residential sites, the parcels were not yet used for residential purposes. No one was living on any of the 14 parcels. No one had built a garage on them. No one had erected a swing set or a swimming pool on them or otherwise was using them as an extended backyard. The 14 parcels were used only to grow and harvest soybeans and corn.

¶ 50 This is not to deny that, despite the growing of crops on a parcel, the parcel can have a primary nonagricultural use. A small garden of sweet corn behind a house does not make a farm. Also, plants typically regarded as crops can serve a different purpose. For example, in *Senachwine Club v. Putnam County Board of Review*, 362 Ill. App. 3d 566, 568-69 (2005), a duck hunting club planted corn, buckwheat, and sudax on its land—all plants that "[could] be grown and harvested extensively for profit or subsistence" (Merriam-Webster's Collegiate Dictionary 276 (10th ed. 2000) (definition of "crop")). The purpose of planting those crops, however, was to create a habitat attractive for ducks. *Senachwine Club*, 362 Ill. App. 3d at 569. The club allowed the crops to remain in the field, or the club intentionally flooded the crop area. *Id.* Despite the planting of the crops, the primary use of the land was recreational. See *id.* The land had no agricultural use. The club never harvested the corn, buckwheat, and sudax any more than the club would have harvested cattails. See *id.* There was no "growing *and harvesting* of crops." (Emphasis added.) See 35 ILCS 200/1-60 (West 2012).

¶ 51    By contrast, in this case, the only present use of the 14 parcels from 2011 to 2013 was the growing and harvesting of crops—activities that are statutory indicia of a "[f]arm." See *id.* The cropland, as far as we know, was not used as commercial hunting grounds.

¶ 52                    2. Conventional Farming Versus Intensive Farming

¶ 53    Defendants contend that because the 14 parcels were not "intensively farmed" and because none of the lots were more than five acres in size, they were ineligible to be assessed as farmland. Defendants base this contention on an interpretation of the penultimate sentence of section 1-60 by the Illinois Department of Revenue (Department): "For purposes of this Code, 'farm' does not include property which is primarily used for residential purposes even though some farm products may be grown or farm animals bred or fed on the property incidental to its primary use." *Id.*

¶ 54    The Department has a duty to "issue guidelines and recommendations for the valuation of farmland to achieve equitable assessment within and between counties." *Id.* § 10-115. To that end, the Department issued Publication 122, which suggests a method for "mak[ing] primary-use determinations on parcels that contain both farm and residential uses." Ill. Dep't of Revenue, *Publication 122, Instructions for Farmland Assessments*, at 5 (Jan. 2013), https:// web.archive.org/web/20121030045517/http:/tax.illinois.gov/Publications/Pubs/Pub-122.pdf [https://perma.cc/56BN-PQXV] (Publication 122). The key, the Department explains, is determining whether the farm use is "intensive" or "conventional." Once the assessor makes that determination, he or she should compare the size of the farmed portion of the parcel to the size of the residential portion of the parcel:

> "According to this guideline, the primary use of a parcel containing only intensive farm and residential uses is residential unless the intensively-farmed portion of the parcel is larger than the residential portion of the parcel. For purposes of this guideline, 'intensive farm use' refers to farm practices for which the per acre income and expenditures are significantly higher than in conventional farm use. Intensive farm use is typically more labor-intensive than conventional farm use. According to this guideline, the primary use of a parcel containing only conventional farm and residential uses is residential unless the conventionally-farmed portion of the parcel is larger than the residential portion of the parcel and it is not less than five acres in area. These presumptions may be rebutted by evidence received that the primary use of the parcel is not residential. For purposes of this guideline, 'conventional farm use' refers to the tending of all major and minor Illinois field crops, pasturing, foresting, livestock, and other activities associated with basic agriculture." *Id.*

¶ 55    Defendants' invocation of this passage from Publication 122 makes no sense. In none of the 14 parcels was there a farmed "portion" as opposed to a residential "portion." See *id.* One could not point to any of the 14 parcels and say that so many square feet were planted in soybeans and so many square feet were taken up by a house and yard and then compare the sizes of the two areas. One could not legitimately say that the 14 lots were "primarily used for residential purposes even though *some* farm products may be grown *** on the property incidental to its primary use." (Emphasis added.) 35 ILCS 200/1-60 (West 2012). The *entire* area of those lots, except for timberland, was taken up by the growing and harvesting of crops. Therefore, denying the 14 parcels a "[c]ropland" classification (*id.* § 10-125) for the tax year 2013 was a clear error. See *AFM Messenger Service, Inc. v. Department of Employment*

*Security*, 198 Ill. 2d 380, 391 (2001); *Santa Fe*, 113 Ill. App. 3d at 875-76.

¶ 56                              C. "Other Farmland"

¶ 57    The parties stipulated that the parcels in Eagle's Nest subdivision, Fox Run subdivision, and Deer Trail subdivision were substantially timberland. Howard testified that there had been no residential or commercial use of those parcels—they were idle woodland, nothing more. His testimony in that respect was uncontradicted. Hence, plaintiff argues, the parcels in those three subdivisions should have been assessed as "[o]ther farmland." 35 ILCS 200/10-125(c) (West 2012).

¶ 58    Under section 10-125 of the Property Tax Code, the term "[o]ther farmland" must be "defined according to U.S. Census Bureau definitions in use during [the] assessment year." *Id.* § 10-125. The Department defines "[o]ther farmland" to include "woodland" (Publication 122, *supra*, at 1). The complete definition reads as follows: "Other farmland includes woodland pasture; woodland, including woodlots, timber tracts, cutover, and deforested land; and farm building lots other than homesites." *Id.* This definition of "other farmland," the Department assures the reader, "compl[ies] with [the] requirement" that " [']other farmland['] *** be defined according to US Bureau of Census definitions." *Id.* None of the parties have ever questioned the Department in that respect.

¶ 59    Nevertheless, the circuit court found the definition of "[o]ther farmland" (35 ILCS 200/10-125(c) (West 2012)) to be unmet. The court's reason was that "the parcels with growing crops [did] not constitute a farm" and, "[w]ithout a farm, there [could not] be 'other farmland.' " As we have discussed, however, there was a "[f]arm" (*id.* § 1-60), and there was "[c]ropland" (*id.* § 10-125(a)), in addition to the timberland. Fourteen parcels, to the extent they were unwooded, were "used solely for the growing and harvesting of crops." *Id.* § 1-60.

¶ 60    Defendants note that, even if some of plaintiff's parcels were cropland during the 2013 tax year, the 70 parcels in Eagle's Nest subdivision, Fox Run subdivision, and Deer Trail subdivision fail to meet the definition of " 'other farmland' " in section 10-150 of the Property Tax Code (*id.* § 10-150) because they were not being managed under a forestry management plan. That section provides as follows:

> "§ 10-150. Property under forestry management plan. In counties with less than 3,000,000 inhabitants, any land being managed under a forestry management plan accepted by the Department of Natural Resources under the Illinois Forestry Development Act [(525 ILCS 15/1 *et seq.* (West 2012))] shall be considered as 'other farmland' and shall be valued at 1/6 of its productivity index equalized assessed value as cropland. In counties with more than 3,000,000 inhabitants, any land totalling 15 acres or less for which an approved forestry management plan was in effect on or before December 31, 1985, shall be considered 'other farmland'. The Department of Natural Resources shall inform the Department and each chief county assessment officer of each parcel of land covered by an approved forestry management plan." *Id.*

The parties stipulated that the "wooded parcels do not qualify for reduced assessments for being enrolled in an IDNR Forestry Management Plan under Section 10-150 of the Property Tax Code." Consequently, defendants dispute that the wooded parcels qualify as "other farmland."

¶ 61    Section 10-150 does not say, however, that *only* timberland being managed under a forestry management plan shall be considered as "other farmland." Instead, section 10-150 says that land being managed under a forestry management plan shall be considered as "other farmland." See *id*. There is a difference. Land that would not qualify as "other farmland" under section 10-125 can qualify as "other farmland" under section 10-150.

¶ 62    How could land qualify as "other farmland" under section 10-150 but not under section 10-125? The answer is that not all the land being managed under a forestry management plan necessarily would meet any of the descriptions in the United States Census Bureau's definition of "other farmland." Up to 10% of the land being managed under a forestry management plan can be "[l]and not supporting forest or growing timber" (provided that "up to 10% of Plan acreage *** is a compatible conservation use or important to conservation and timber management and occurs as an integrated, inseparable[,] or adjacent natural resource"). 17 Ill. Adm. Code 1537.5(a) (2017). So, if 90 acres of timberland merged into 10 acres of land that was too wet or swampy for trees and if the 100 acres were being managed under a forestry management plan accepted by the Illinois Department of Natural Resources, the 10 acres would qualify as "other farmland" under section 10-150. That would be the case even if the 10 acres failed to meet the definition of "other farmland" in section 10-125 (which adopts the United States Census Bureau's definition). That is, even if the 10-acre swamp were not a woodland pasture, a woodland, a woodlot, a timber tract, a cutover, deforested land, or a farm building lot (see Publication 122, *supra*, at 1), it nevertheless would qualify as "other farmland" under section 10-150. In that way, section 10-150 adds to section 10-125 instead of taking away from it.

¶ 63    A contrary interpretation would put the two statutory sections in conflict. By accepting defendants' interpretation of section 10-150—by reading section 10-150 as meaning that *only* land being managed under a forestry development plan qualifies as "other farmland"—we would put that section on a collision course with section 10-125. On the one hand, section 10-125 would say that "farm building lots other than homesites" qualify as "other farmland." *Id.* On the other hand, section 10-150 would say that farm building lots do not qualify because "[l]ands used as *** commercial farmland *** are not eligible for enrollment" (17 Ill. Adm. Code 1537.5(a)(1) (2017)) and "[n]o acre on which a permanent building is located shall be included in calculations of acreage for the purpose of determining eligibility" (*id.* § 1537.5(b)). On the one hand, section 10-125 would say that "deforested land" qualifies as "other farmland." Publication 122, *supra*, at 1. On the other hand, section 10-150 would say that "[a] minimum of 90% of lands designated in the Plan must physically and biologically support forests and timber." 17 Ill. Adm. Code 1537.5(a) (2017). On the one hand, section 10-125 would say that a "timber tract[ ]" of any size, left to its own devices, qualifies as "other farmland." Publication 122, *supra*, at 1. On the other hand, section 10-150 would say that the timber tract must be big enough and must be skillfully managed. It must be "at least 10 contiguous acres of land that is systematically managed for the production of timber and natural resource conservation." 17 Ill. Adm. Code 1537.5(b) (2017).

¶ 64    "[I]f there be two affirmative statutes or two affirmative sections in the same statute, on the same subject, the one does not repeal the other if both may consist together, and the courts will seek for such a construction as will reconcile them." *Schneider v. Board of Appeals*, 402 Ill. 536, 545 (1949). By construing section 10-150 as meaning merely what it says—that "land being managed under a forestry management plan *** shall be considered as 'other farmland' "

(35 ILCS 200/10-150 (West 2012))—and as not meaning what it does not say—that *only* such land shall be considered as "other farmland"—we easily reconcile section 10-125 (*id.* § 10-125) and section 10-150 (*id.* § 10-150).

¶ 65 Because we reject defendants' interpretation of section 10-150 and because the circuit court's denial of an "other farmland" classification relied on the mistaken premise that there was no farm, we hold that the parcels in Eagle's Nest subdivision, Fox Run subdivision, and Deer Trail subdivision were "other farmland." The circuit court's finding to the contrary was clearly erroneous. See *AFM*, 198 Ill. 2d at 391.

¶ 66 Given our holding that those three subdivisions were "other farmland" in 2011, 2012, and 2013, we agree with the circuit court—though for a different reason—that they were not "wasteland." See 35 ILCS 200/10-125(d) (West 2012). The Department defines "[w]asteland" as "that portion of a qualified farm tract that is not put into *** other farmland." Publication 122, *supra*, at 1. Eagle's Nest subdivision, Fox Run subdivision, and Deer Trail subdivision were "other farmland" and, hence, not wasteland. See *id.*

¶ 67 D. The Developer's Exemption

¶ 68 The circuit court found the developer's exemption in section 10-30 of the Property Tax Code (35 ILCS 200/10-30 (West 2012)) to be unavailable to plaintiff because the property "was sold several times since it was platted and developed" and plaintiff was "a subsequent purchaser of the property, not the developer."

¶ 69 In our *de novo* interpretation of section 10-30 (see *City of Charleston*, 2019 IL App (4th) 180634, ¶ 25), particularly subsection (c) (35 ILCS 200/10-30(c) (West 2012)), we agree with the circuit court that a sale of the property after it is platted and developed ends the developer's exemption. That conclusion flows from the plain language of section 10-30, which provides as follows:

"§ 10-30. Subdivisions; counties of less than 3,000,000.

(a) In counties with less than 3,000,000 inhabitants, the platting and subdivision of property into separate lots and the development of the subdivided property with streets, sidewalks, curbs, gutters, sewer, water and utility lines shall not increase the assessed valuation of all or any part of the property, if:

(1) The property is platted and subdivided in accordance with the Plat Act [(765 ILCS 205/0.01 *et seq.* (West 2012))];

(2) The platting occurs after January 1, 1978;

(3) At the time of platting the property is in excess of 5 acres; and

(4) At the time of platting the property is vacant or used as a farm as defined in Section 1-60.

(b) Except as provided in subsection (c) of this Section, the assessed valuation of property so platted and subdivided shall be determined each year based on the estimated price the property would bring at a fair voluntary sale for use by the buyer for the same purposes for which the property was used when last assessed prior to its platting.

(c) Upon completion of a habitable structure on any lot of subdivided property, or upon the use of any lot, either alone or in conjunction with any contiguous property, for any business, commercial or residential purpose, *or upon the initial sale of any platted lot, including a platted lot which is vacant: (i) the provisions of subsection (b)*

*of this Section shall no longer apply in determining the assessed valuation of the lot*, (ii) each lot shall be assessed without regard to any provision of this Section, and (iii) the assessed valuation of the remaining property, when next determined, shall be reduced proportionately to reflect the exclusion of the property that no longer qualifies for valuation under this Section. Holding or offering a platted lot for initial sale shall not constitute a use of the lot for business, commercial or residential purposes unless a habitable structure is situated on the lot or unless the lot is otherwise used for a business, commercial or residential purpose.

(d) This Section applies before the effective date of this amendatory Act of the 96th General Assembly and then applies again beginning January 1, 2012." (Emphasis added.) *Id.* § 10-30.

¶ 70    It is undisputed that plaintiff bought all of the platted lots in question after previous owners did the platting and development. (By "development," we mean the electrical service boxes, water mains, and telephone lines.) In fact, when plaintiff bought the property in the sheriff's sale of 2008, the property already had been sold by previous developers several times. Before plaintiff's ownership, the "initial sale" of the platted lots (whenever that "initial sale" was) should have ended the developer's relief. See *id.* § 10-30(c). As the Department explains:

"When any sale occurs, the preferential assessment is removed. It does not matter that one developer sold land to another developer.

***

If the entire development is sold to another developer, then that entire development no longer qualifies for the preferential assessment. This applies even if no habitable structures have been built or the area has not been used for any business, commercial, or residential purpose." Illinois Department of Revenue, *Publication 134, Developer's Exemption, Property Tax Code, Section 10-30*, at 3 (Mar. 2016), https://www2.illinois. gov/rev/research/publications/pubs/Documents/pub-134.pdf, [https://perma.cc/FY7L-HKK9] (Publication 134).

¶ 71    Plaintiff argues that, even though all the platted parcels have been sold several times over, the developer's exemption continues to be available "*until and unless* there is a change in the use of the property from farmland to residential, business[,] or commercial use." (Emphasis in original.) In support of that argument, plaintiff cites *Paciga v. Property Tax Appeal Board*, 322 Ill. App. 3d 157, 162-63 (2001), in which the appellate court concluded as follows: "[T]he language of subsection 10-30(c), interpreted with the aid of the legislative purpose, reveals that no change in valuation will occur until a habitable structure is constructed on one of the lots or one of the lots is used for any business, commercial, or residential purpose."

¶ 72    We agree with that statement in *Paciga*, as far as it goes. But *Paciga* overlooks that an initial sale likewise can change the valuation. "[U]pon the initial sale of any platted lot, including a platted lot which is vacant," the preferential assessment "shall no longer apply in determining the assessed valuation of the lot." 35 ILCS 200/10-30(c) (West 2012). Thus, if a platted lot is sold, the lot no longer receives the preferential assessment. If all the platted lots are sold, they no longer receive the preferential assessment.

¶ 73    In this case, all of the platted lots in question were sold after they were platted and developed. "If the entire development is sold to another developer, then that entire development no longer qualifies for the preferential assessment." Publication 134, *supra*, at 3.

Therefore, we find no clear error in the circuit court's denial of a developer's exemption. See *id.*; *AFM*, 198 Ill. 2d at 391.

¶ 74                                    III. CONCLUSION

¶ 75        The circuit court was right to grant the section 2-619 motion to dismiss count II of the amended complaint. Plaintiff is collaterally estopped from asserting the enforceability of the settlement agreement. The decision on count I, however, should have been in plaintiff's favor—not because plaintiff is entitled to a developer's exemption; the circuit court is correct that the initial sale of the lots, after their development, ended that exemption. Rather, plaintiff should have prevailed on count I because the only use to which the land was put in 2011, 2012, and 2013 was the growing and harvesting of crops. It is true that the land had been prepared, to some extent, for future residential use. But the land presently was used only as farmland, not for residential purposes, and present use is what counts. Therefore, we affirm in part and reverse in part the circuit court's judgment.

¶ 76        Affirmed in part and reversed in part.